*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
October 07, 2025
1:39 PM

Plaintiff-Appellee,

v

No. 365368
Wayne Circuit Court
LC No. 19-009232-01-FC

TYWON IVEY,

Defendant-Appellant.

Before: GARRETT, P.J., and K. F. KELLY and SWARTZLE, JJ.

PER CURIAM.

Defendant, Tywon Ivey, approached Anthony Lee Brown at a gas station and asked him for money while Ivey's accomplice, Austin Williams, stood nearby. After Brown gave Ivey $10, Ivey shot the man, and Ivey and Williams fled in Brown's vehicle. The prosecutor charged Ivey with assault with intent to murder, MCL 750.83; carjacking, MCL 750.529a; armed robbery causing serious injury, MCL 750.529; receiving and concealing a stolen motor vehicle, MCL 750.535(7); and three counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1). During his opening statement at trial, Wayne County Assistant Prosecutor Ron Haywood informed the jury that Williams identified Ivey as his accomplice during a police interrogation. Through this lens, the jury viewed the evidence presented. During Haywood's closing and rebuttal arguments, he again informed the jury that Williams had named Ivey as his accomplice. Ivey appeals by right his convictions of the charged offenses. We conclude that Haywood's statements constituted prosecutorial misconduct and that Ivey's trial attorney rendered ineffective assistance of counsel by failing to take any steps to safeguard Ivey's right to fair trial. We further conclude that Ivey is entitled to a new trial as a result of the errors. We therefore reverse and remand for further proceedings.

## I. FACTUAL BACKGROUND

In the early morning hours of October 25, 2019, Brown purchased cigarettes at a gas station in Detroit. While Brown was walking back to his truck with the cigarettes, Ivey approached him and asked for a dollar. Brown gave Ivey two $5 bills, and noticed Williams approaching Brown from behind. Ivey then pointed a gun at Brown's face and asked for the keys to Brown's truck.

-1-

After Brown gave Ivey the keys, Ivey shot Brown in the face and drove away in the truck with Williams in the passenger seat.

Police obtained surveillance video from a liquor store across the street from the gas station that showed activity that occurred on October 23, 2019.[1] The police released still photographs of the footage to the media and arrested Williams based on information received thereafter. During a police interview, Williams identified Ivey as the other participant in the shooting.[2] Thereafter, Brown identified Ivey as the shooter during a live lineup.

The identification of Ivey as Williams's accomplice was the sole issue at trial, and Ivey's theory of defense was to challenge Brown's identification of him. During his opening statement, Assistant Prosecutor Haywood informed the jury that Williams identified Ivey as his accomplice in a statement to the police. Haywood stated as follows:

> [The police] are able to find Mr. Williams, take Mr. Williams into custody, interrogate Mr. Williams.
>
> After a while, he finally admitted who his co-defendant was.
>
> The defendant.

However, Williams did not testify at trial. Haywood called only three witnesses: Brown, Detroit Police Officer Jacob Hebner, and Detroit Police Sergeant Sean Dunning.

During Haywood's closing argument, he again informed the jury that Williams identified Ivey as his accomplice. Haywood argued:

> So, [the police] release these videos, uhm, stills of these videos, to the media, and they get a name.
>
> They get a name of Austin Williams.
>
> They take Austin Williams into custody.
>
> And, after they speak to Officer—uh, Austin Williams, they go out, and they get the defendant, or they start looking for the defendant, as a suspect in this crime.

---

[1] Because the shooting occurred at approximately 2:00 a.m. on October 25, 2019, activity that occurred on October 23, 2019, is oftentimes referenced in the record as having occurred the day before the shooting.

[2] The prosecutor charged Williams with the same charges asserted against Ivey as well as with unlawfully driving away a motor vehicle, MCL 750.413, and two additional counts of felony-firearm. Williams pleaded guilty to carjacking, and the prosecutor dismissed the remaining charges against him.

Further, during Haywood's rebuttal argument, he told the jury a third time that Williams named Ivey as his accomplice:

> The Court's gonna say, you can consider other evidence, along with [Brown's] identification, when trying to determine if the identification is correct or not.

> And one of the things you have to look at—well, [the police] didn't even know Mr. Ivey, or Mr. Williams, when this happened.

> That's why they had to take the still photographs, and put it out to the media, put it out to the public.

> And they got a name.

> And they went, and they picked up that person, Mr. Williams.

> And then, they got another name, the defendant.

As previously stated, the jury convicted Ivey as charged. Ivey moved for a new trial and to correct his sentence, arguing that his trial attorney, Earl Washington, rendered ineffective assistance of counsel by failing to object when Haywood told the jury that Williams had identified Ivey as his accomplice. Ivey also argued that Washington rendered ineffective assistance by failing to object to a portion of Officer Hebner's testimony on Confrontation Clause grounds. In addition, Ivey challenged the scoring of offense variable (OV) 13 and asserted that the imposition of court costs constituted an excessive fine. The trial court denied the motion. This appeal followed.

## II. OFFICER HEBNER'S TESTIMONY

We first address Ivey's claim that Washington's representation was deficient because he failed to object to Officer Hebner's testimony on Confrontation Clause grounds. Whether defense counsel rendered ineffective assistance of counsel "is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Clear error exists if we are left with a definite and firm conviction that error occurred. *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021). Because the trial court did not hold a *Ginther*[3] hearing before it decided Ivey's motion for a new trial, and this Court denied Ivey's motion to remand for a *Ginther* hearing,[4] "our review is limited to mistakes apparent on the record." *People v Cox*, 268 Mich App 440, 453; 709 NW2d 152 (2005).

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[4] *People v Ivey*, unpublished order of the Court of Appeals, entered November 12, 2024 (Docket No. 365368).

"Both the Michigan and the United States Constitutions require that a criminal defendant enjoy the assistance of counsel for his or her defense." *Trakhtenberg*, 493 Mich at 51; see also Const 1963, art 1, § 20; US Const, Am VI. "In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Id.* Effective assistance of counsel is presumed, and the defendant must overcome the strong presumption that trial counsel's performance constituted sound trial strategy. *People v Loew*, 340 Mich App 100, 120; 985 NW2d 255 (2022). "A sound trial strategy is one that is developed in concert with an investigation that is adequately supported by reasonable professional judgments." *People v Grant*, 470 Mich 477, 486; 684 NW2d 686 (2004). We will not substitute our judgment for that of counsel concerning matters of trial strategy, nor will we assess counsel's performance with the benefit of hindsight. *Loew*, 340 Mich App at 120.

"The Sixth Amendment of the United States Constitution and Article 1, § 20 of Michigan's Constitution provide a defendant with the right to confront the witnesses against him." *People v Washington*, 514 Mich 583, 592; 22 NW3d 507 (2024). This right "bars the admission of testimonial statements of a witness who did not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity to cross-examine the witness." *People v Bennett*, 290 Mich App 465, 481; 802 NW2d 627 (2010) (quotation marks and citation omitted). Because the Confrontation Clause applies only when persons bear testimony against the accused, the right to confront witnesses is implicated only with respect to testimonial evidence. *People v Bruner*, 501 Mich 220, 227; 912 NW2d 514 (2018) (quotation marks and citation omitted). "The threshold question for any Confrontation Clause challenge, therefore, is whether the proffered evidence is testimonial." *Id*.

"A statement is testimonial if it was made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Washington*, 514 Mich at 592-593 (quotation marks, citation, and brackets omitted). "[S]tatements are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *People v Spangler*, 285 Mich App 136, 154; 774 NW2d 702 (2009) (quotation marks and citations omitted). "[E]ven if the statement is testimonial, the Confrontation Clause applies only to statements used as substantive evidence." *Washington*, 514 Mich at 593 (quotation marks and citation omitted). The right of confrontation "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id*. (quotation marks and citation omitted).

During Haywood's direct examination of Officer Hebner, Haywood asked Hebner about three photographs that the trial court admitted as prosecution exhibits 5, 6, and 7. The photographs were still shots taken from surveillance video footage of the liquor store across the street from the gas station. Haywood questioned Hebner as follows:

> *Q*. And, uhm, where were those exhibits taken?
>
> *A*. These were from a liquor store, directly across the street. I believe it was, uhm, 13120 Dexter, directly across the street from where the incident occurred.

And they were take[n] that night before, on the 23rd.

Uhm, well, they were stills from the video, from the, from the 23rd.

Q. And why, why, uh, why was that significant to, to, to look at that area of that store, at that time?

A. So, when we made the scene for the initial incident, on the 25th, we spoke with, not just the victim, but the employees of the gas station, who stated they had—

MR. WASHINGTON: Objection to hearsay, Your Honor.

THE COURT: Okay.

Sustained.

Q. (By Mr. Haywood): You spoke, you said, you spoke to people at the gas station?

A. Correct.

Q. And based on speakin' to those people at the gas station, what, if anything, did—was done?

A. We followed up by reviewing video from the 23rd. Uh, we were given information that the—

MR. WASHINGTON: Speculation—

THE COURT: You can indicate what you did with that information. Don't indicate, don't indicate what anybody told you.

WITNESS: Yes, sir.

Q. (By Mr. Haywood): All right.

A. Based on the information I received, at the scene, I had reason to believe that there—

THE COURT: Well, just indicate what you did, sir.

WITNESS: Oh, I'm sorry.

We reviewed the video from across the street, of possible—the same subject had been there the night before.

Q. (By Mr. Haywood): And when you reviewed the video, did you see the same suspects, uhm, from the date, the 25th, the day before?

-5-

*A.* Yes, sir.

*Q.* Okay. Now, the stills, 5, 6, and 7, uhm, are those of the video that you, uhm, that was, that was pulled from that location?

*A.* They do appear to be, yes, sir.

Following the above colloquy, Haywood moved to admit prosecution exhibits 5, 6, and 7 into evidence.

Ivey argues that Washington rendered ineffective assistance of counsel when he failed to object on Confrontation Clause grounds to Officer Hebner's testimony concerning what the gas station owner, Hasan Tabakovic, told Hebner. It is unclear whether Hebner was referring to Tabakovic when he referenced "employees" at the gas station, but, notably, Tabakovic did testify at Ivey's preliminary examination. Ivey contends that Hebner's testimony conveying the substance of Tabakovic's communication to Hebner without Tabakovic testifying at trial violated Ivey's right of confrontation.[5] Ivey compares this case to *Washington*, 514 Mich 583.

In *Washington*, the defendant drove across the bridge from the United States to Canada and crossed the border without paying the toll. Canadian customs agent Matthew Lavers stopped the defendant's vehicle and took him into custody. Lavers then transported the defendant back across the border where United States customs agent Paul Stockwell took the defendant along with a bulletproof vest into custody. The prosecution charged the defendant with possession of body armor by a person convicted of a violent felony. *Id*. at 588.

Before trial, the Canadian government advised that Lavers would not be testifying at the defendant's trial. *Id*. The defendant then moved to exclude evidence of the bulletproof vest on the basis that the only way for the prosecution to establish the evidentiary foundation or chain of custody of the vest was though testimony that would violate his confrontation clause rights. *Id*. at 588-589. The trial court denied the motion, but prohibited the prosecutor from eliciting testimony regarding Lavers's statements. *Id*. at 589. At trial, Stockwell did not testify regarding what Lavers's had told him, but he testified that he communicated with Lavers, and, based on those communications, he took custody of the defendant and the body armor. *Id*. Following trial, the defendant moved to vacate his conviction, arguing that Lavers's statement to Stockwell indicating that the defendant possessed the bulletproof vest was testimonial, and the statement was implicitly admitted through Stockwell's testimony without the opportunity to cross-examine Lavers. *Id*. at 590-591. Our Supreme Court agreed that the statement was testimonial and opined that a defendant's Confrontation Clause rights are violated when a witness's testimony introduces the

---

[5] Haywood may have intended to call Tabakovic as a witness at trial. At the beginning of the second day of trial, Haywood informed the trial court that he intended to call three witnesses that day, but one witness was delayed because of a traffic accident on the freeway. Haywood then called Officer Hebner and Sergeant Dunning to testify, but not a third witness. In any event, neither Tabakovic nor a gas station employee testified at trial.

substance of an unavailable witness's out-of-court testimonial statement. *Id*. at 596-597, 601-602. The Court stated:

> [W]e hold that the Confrontation Clause is violated when a witness's testimony at trial introduces an out-of-court statement of an unavailable witness if the witness's testimony leads to a clear and logical inference that the out-of-court declarant made a testimonial statement. [Footnote omitted.]  In such a situation, the defendant is not able to cross-examine the veracity of the out-of-court statement, and the defendant is thereby denied his constitutional right to confront the witness. [*Id*. at 602-603.]

> * * *

> The clear and logical inference from Officer Stockwell's testimony is that during their "communications," Officer Lavers made an out-of-court statement regarding his belief that defendant possessed the body armor.  As discussed above, that statement was testimonial.  We therefore affirm the Court of Appeals holding that defendant's right to confront his accuser, Officer Lavers, was violated.  [*Id*. at 604.]

Similar to *Washington*, Officer Hebner's testimony explained actions he took based on information he received from gas station employees.  It is clear from Hebner's testimony that the employees told him that at least one of the perpetrators was across the street at the liquor store on October 23, 2019, two days before the shooting.  Ivey argues that the statements from the gas station employees—or Tabakovic—were testimonial and admitted through Hebner's testimony in violation of his Confrontation Clause right to cross-examination.  We conclude that this case is distinguishable from *Washington* because the statement at issue—that a suspect was at the liquor store on October 23, 2019—was not admitted for the truth of the matter asserted.  See *Washington*, 514 Mich at 593 ("The Confrontation Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.") (quotation marks, citation, and brackets omitted).

In *People v Chambers*, 277 Mich App 1, 3; 742 NW2d 610 (2007), the defendant robbed a woman as she used an ATM machine.  Still shots developed from video surveillance footage of the ATM machine were broadcast on television, and an informant working with an FBI agent recognized and identified the man shown in the still shots.  *Id*. at 4.  The FBI agent then contacted the detective working the case and informed the detective of the man's identity.  On the basis of that information, the police set up a surveillance team and monitored the defendant's home. Officers arrested the defendant when he returned to the home.  *Id*.

At the defendant's trial, the detective testified that the FBI agent telephoned him and told him that an informant recognized the perpetrator as the defendant.  *Id*. at 10.  The defendant argued that the detective's testimony violated his right of confrontation.  *Id*.  This Court disagreed, stating as follows:

> In the present case, the challenged testimony did not violate defendant's right of confrontation.  The testimony was not offered to establish the truth of the

informant's tip. Rather, it was offered to establish and explain why the detective organized a surveillance of defendant's home and how defendant came to be arrested. Because the Confrontation Clause does not bar the use of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted, the testimony did not violate defendant's right of confrontation. [*Id*. at 11.]

Similar to *Chambers*, Officer Hebner's challenged testimony was not admitted for the truth of the matter asserted—that at least one of the suspects was at the liquor store on October 23, 2019. Rather, in response to Haywood's question asking what Hebner did after speaking to the gas station employees, Hebner stated that he and Sergeant Dunning reviewed surveillance video from the liquor store across the street. Hebner's testimony was not offered for its truth, but rather, to explain why he and Dunning reviewed the surveillance video. The testimony was also admitted to lay the foundation for the still shots of the video, admitted as prosecution exhibits 5, 6, and 7. Because the communication from the gas station employees was not admitted for its truth, the evidence did not violate Ivey's Confrontation Clause rights, and Washington did not render ineffective assistance of counsel by failing to object to the evidence on Confrontation Clause grounds. As this Court stated in *Chambers*, "because the testimony did not violate defendant's right of confrontation, any objection to the testimony would have been futile. Counsel is not ineffective for failing to make a futile objection." *Id*.

## III. HAYWOOD'S OPENING STATEMENT AND CLOSING ARGUMENT

Ivey next argues that Washington rendered ineffective assistance of counsel by failing to object when Haywood told the jury during his opening statement and closing argument that Williams identified Ivey as his accomplice. We agree and also conclude that Haywood's comments constituted misconduct because Haywood knew that Williams would not be testifying at trial and told the jury that Williams had implicated Ivey notwithstanding that evidence regarding Williams's statement would constitute hearsay and be inadmissible on Confrontation Clause grounds.

An attorney's "[o]pening statement is the appropriate time to state the facts that will be proved at trial." *People v Ericksen*, 288 Mich App 192, 200; 793 NW2d 120 (2010). "The purpose of closing argument is to allow attorneys to comment on the evidence and to argue their theories of the law to the jury." *People v Clark*, 330 Mich App 392, 433; 948 NW2d 604 (2019) (quotation marks and citation omitted). "Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial," and "are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008). However, "[a]n attorney may not refer to facts that are not in the record." *People v Meissner*, 294 Mich App 438, 457; 812 NW2d 37 (2011).

Haywood informed the jury during his opening statement, closing argument, and rebuttal argument that Williams told the police that Ivey was his accomplice.[6] During Haywood's opening statement, he directly told the jury that Williams had named Ivey:

> [The police] are able to find Mr. Williams, take Mr. Williams into custody, interrogate Mr. Williams.
>
> After a while, he finally admitted who his co-defendant was.
>
> The defendant.

Haywood told the jury that Williams identified Ivey as his accomplice notwithstanding that Williams was not on Haywood's witness list and would not be testifying at trial. Accordingly, Williams's statement implicating Ivey was hearsay, and evidence concerning the statement would have violated Ivey's right to confront Williams.

"In general, hearsay—an out-of-court statement offered to prove the truth of the matter asserted—may not be admitted into evidence." *People v Green*, 313 Mich App 526, 531; 884 NW2d 838 (2015). The trial court recognized that Williams's statement implicating Ivey constituted hearsay and ruled as such when Haywood attempted to admit the statement through Officer Hebner's testimony:

> *Q.* (*By Mr. Haywood*): So, based on the name, Austin Williams, what did you do?
>
> *A.* Based on that information, we were able to take that individual into custody, after we showed a line up, to the victim, with that individual.
>
> The victim was able to positively I.D. them.
>
> At which point, we went and took that, Mr. Williams, into custody.
>
> *Q.* Do you know if he, if Mr. Williams was spoken to?
>
> *A.* He was.
>
> *Q.* Did you speak to him, or did someone else?
>
> *A.* I did not, personally, speak with Mr. Williams.
>
> *Q.* After—do you remember who spoke to, to Mr. Williams?

---

[6] Although Ivey challenges Haywood's statements made during his opening statement and closing argument only, the record shows that Haywood also informed the jury during his rebuttal argument that Williams had named Ivey as his accomplice.

*A*.  That was the original Officer in charge, Officer Brandis, as well as Detective Terry Cross-Nelson.

*Q*.  After the defendant was spoken to, was another name—

*THE COURT*:  When you say, the defendant, why don't you say, Mr. Williams?

*Q*.  (*By Mr. Haywood*): After Mr. Williams was spoken to, did you get another name?

*A*.  Yes.

*THE COURT*:  One, one second.

One second.

Can the parties approach?

(Whereupon a discussion was had off the record, at the bench, from 9:19 a.m. to 9:22 a.m.)

*THE COURT*:  As indicated, anything that Mr. Williams tell the Police, is hearsay, and it will not be considered.

And I'm not going to allow it in.

Thus, the trial court properly refused to allow Hebner to testify regarding the name that Williams had given the other officers, although it is clear from Haywood's line of questioning that Williams had named Ivey, and Haywood already told the jury during his opening statement that Williams had named Ivey.

During Haywood's closing and rebuttal arguments, he again informed the jury that Williams had implicated Ivey.  Although Haywood's closing and rebuttal arguments did not convey that fact as directly as his opening statement, his comments clearly indicated that Williams told the police Ivey was the other person involved in the shooting.  Haywood stated as follows during his closing argument:

[The police] take Austin Williams into custody.

And, after they speak to Officer—uh, Austin Williams, they go out, and they get the defendant, or they start looking for the defendant, as a suspect in this crime.

Similarly, Haywood stated as follows during his rebuttal argument:

And [the police] got a name.

-10-

And they went, and they picked up that person, Mr. Williams.

And then, they got another name, the defendant.

In addition to Williams's statement being inadmissible on hearsay grounds, Haywood informing the jury about the statement implicated Ivey's Confrontation Clause rights. As previously discussed, "[t]he Confrontation Clause of the Sixth Amendment bars the admission of testimonial statements of a witness who did not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity to cross-examine the witness." *Bennett*, 290 Mich App at 481 (quotation marks and citation omitted). "Police interrogations . . . solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator, fall squarely within the class of testimonial hearsay subject to the Confrontation Clause." *People v Walker*, 273 Mich App 56, 63; 728 NW2d 902 (2006) (quotation marks and citation omitted). The prosecution argues that Ivey's Confrontation Clause protections were not implicated because Haywood's statements to the jury did not constitute evidence. Although the prosecution is correct that Haywood's statements did not constitute evidence, they raised the same concerns underlying a Confrontation Clause violation.

In *Bruton v United States*, 391 US 123, 124; 88 S Ct 1620; 20 L Ed 2d 476 (1968), the petitioner was charged with armed postal robbery and tried jointly with his codefendant, Evans. During trial, a postal inspector testified that Evans confessed to the armed robbery and named the petitioner as his accomplice. Evans did not testify. *Id*. at 124, 136. The trial court instructed the jury that it could consider Evans's confession against Evans, but that the jury should disregard the evidence against the petitioner because the confession constituted inadmissible hearsay against the petitioner. *Id*. at 125. The Supreme Court determined that the trial court's limiting instruction was insufficient to protect the petitioner's rights. *Id*. at 137. The Court stated:

> It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information. Nevertheless . . . there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed. [*Id*. at 135-136 (footnotes and citations omitted).]

\* \* \*

-11-

Here the introduction of Evans' confession posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all. [*Id*. at 137.]

As the *Bruton* Court recognized, a perpetrator's statements implicating an accomplice are not only "devastating" but also suspect. Because of the unreliability of such evidence, the opportunity for cross-examination is paramount to protect the defendant's right to a fair trial. Indeed, the risk to that right is the threat against which the Confrontation Clause was designed to protect. The *Bruton* Court also recognized that evidence of a nontestifying codefendant's statements implicating the defendant can be so damaging that a limiting instruction cannot ameliorate the threat. The Michigan Supreme Court has also recognized this concern:

Since we presume juries follow their instructions, the result of a limiting instruction can often be as effective as excluding or redacting the testimony. But other times evidence is too compelling for a jury to ignore even with a limiting instruction. Especially relevant here, limiting instructions are categorically inadequate to protect against evidence that a nontestifying defendant confessed and implicated a codefendant in that confession. *Bruton*, 391 US 123. In such a case, the confrontation problem persists as if no instruction had been given at all. *Id*. at 137. [*Bruner*, 501 Mich at 228.]

In this case, although Haywood's statements to the jury did not constitute evidence, his comments informing the jury that Williams named Ivey as his accomplice had the same effect as if evidence of Williams's statements had been admitted as evidence. Haywood told the jury outright what he could not establish with evidence because doing so would constitute hearsay and violate Ivey's right to confront Williams. Haywood's statements therefore amounted to prosecutorial misconduct.

In addition, Washington's failure to object to Haywood's statements fell below an objective standard of reasonableness. The prosecution asserts that Washington's failure to object may have been strategic because the trial court instructed the jury that the attorneys' statements were not evidence. Ivey maintains that no strategic reason explains Washington's failure to object. Ivey refers to his appellate counsel's offer of proof indicating that Washington told counsel that Williams's statement would have been "a big problem" if it was admitted and that he would have objected if he had heard Haywood's comment during opening statements. Notably, however, Washington likewise failed to object during Haywood's closing and rebuttal arguments, and nothing indicates that he did not hear Haywood's statements made during those arguments. In any event, the standard is objective, and Washington's failure to object fell below an objective standard of reasonableness. This is particularly true with respect to Haywood's opening statement. If Washington did not want to object in the presence of the jury and draw attention to Haywood's comment, he could have asked to approach the bench after Haywood's opening statement and moved for a mistrial. There was no strategic reason not to do so considering that trial had just begun, and no evidence had been presented at that point. But, Washington failed to take any steps

to address the issue, and trial proceeded with the jury having been advised that Williams named Ivey as the shooter.

The question remains whether Haywood's prosecutorial misconduct and Washington's ineffective assistance of counsel requires reversal of Ivey's convictions. We review unpreserved instances of prosecutorial misconduct for plain error. *Isrow*, 339 Mich App at 529. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. (quotation marks and citation omitted). The third prong "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (quotation marks and citation omitted). "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. (citation omitted). In order to obtain a new trial on the basis of ineffective assistance of counsel, the defendant must show that, but for counsel's deficient performance, there exists a reasonable probability that the outcome would have been different. *Id.* at 9. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted).

We conclude that Ivey is entitled to a new trial as a result of the errors. Haywood's misconduct was plain, it denied Ivey his right to confront Williams, and, as a result, it denied Ivey a fair trial. Ivey's entire defense hinged on his identification as one of the perpetrators, but, within minutes after Haywood began his opening statement, he told the jury that Williams named Ivey as his accomplice. Thus, the jury was advised before any evidence was admitted that the only person who definitively knew the other perpetrator's identity told the police that the other person was Ivey. The information seriously undermined Ivey's defense and his ability to challenge Brown's identification of him. Notably, Brown testified that he viewed the lineup for 10 or 15 minutes before he selected Ivey from the lineup, and Sergeant Dunning testified that Brown viewed the lineup for two minutes before he selected Ivey. Accordingly, there was a significant discrepancy regarding the amount of time Brown took when he viewed the lineup, and Haywood's statements that Williams implicated Ivey hindered Washington's ability to call into question Brown's identification.

Further, as previously discussed, Haywood's statements implicated Ivey's right to confront Williams. In *Bruton* and *Bruner*, the United States Supreme Court and the Michigan Supreme Court, respectively, recognized that limiting instructions were insufficient to shield the accused from a Confrontation Clause violation. See *Bruton*, 391 US at 137 ("[W]e cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all."); *Bruner*, 501 Mich at 228 ("[L]imiting instructions are categorically inadequate to protect against evidence that a nontestifying defendant confessed and implicated a codefendant in that confession."). Accordingly, we hold that the trial court's instructions that the attorneys' statements were not evidence were insufficient to protect Ivey's right of confrontation. Haywood's statements in addition to Washington's failure to take any steps to alleviate the taint of the statements seriously affected the fairness of the proceedings. Likewise, we conclude that there exists a reasonable probability that the outcome would have been different but for Washington's deficient handling of the matter. As such, Ivey is entitled to a new trial.

-13-

IV. CONCLUSION

Because prosecutorial misconduct and ineffective assistance of counsel denied Ivey his right to confrontation and a fair trial, we reverse his convictions and remand for a new trial. Given this determination, we need not address Ivey's remaining arguments regarding OV 13 and the imposition of court costs.

Reversed and remanded for further proceedings. We do not retain jurisdiction.

/s/ Kristina Robinson Garrett
/s/ Kirsten Frank Kelly
/s/ Brock A. Swartzle